IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 21, 2016

**STATE OF TENNESSEE v. STEVEAN WILSON**

**Appeal from the Criminal Court for Knox County
No. 103214      Scott Green, Judge**

_____

**No. E2015-01446-CCA-R3-CD – Filed April 22, 2016**

_____

The Defendant, Stevean Wilson, pleaded guilty to aggravated assault, and the trial court entered the agreed sentence of six years with the manner of service of the sentence to be determined after a hearing. After the hearing, the trial court denied the Defendant an alternative sentence and ordered that he serve his sentence in confinement. On appeal, the Defendant contends that the trial court erred when it denied his request for an alternative sentence. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE, J., joined. CAMILLE R. MCMULLEN, J., filed a dissenting opinion.

Keith Lee Lieberman, Knoxville, Tennessee, for the appellant, Stevean Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme P. Knight, District Attorney General; and Phillip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION
I. Facts**

This case arises from a video-recorded incident during which the Defendant and his friends assaulted the victim in a Cookout restaurant. For this incident, a Knox County grand jury indicted the Defendant for aggravated assault and criminal gang offense enhancement. The Defendant entered a plea of guilty to aggravated assault, and the State agreed to dismiss the other charge. A transcript of the guilty plea hearing is not included in the record.

At the sentencing hearing, the parties presented the following evidence: Terry Pate, an officer with the Repeat Offender Squad of the Knoxville Police Department, testified that he investigated the assault in this case, which occurred on February 14, 2014. He said that his son showed him a video of the incident, which had been uploaded to a website called "World Star Hip Hop," and he recognized one of the suspects involved. Officer Pate made a recording of the video, which he said was still accessible online and had been viewed more than two million times. Officer Pate said that there were over 18,000 comments on the video, most of which were in support of the suspects' actions.

Officer Pate testified that he accessed the Defendant's Instagram account, a social media site wherein members can post videos and pictures. In one picture of the Defendant on his Instagram account, the Defendant was displaying his fingers to show a "Westside" sign. Through further investigation, the officer determined that the Defendant, whose nickname was "Tank Loc 60," was affiliated with the Crips gang. More specifically, he was a member of the Rolling 60s Crips. In another Instagram picture, the Defendant was showing another known gang sign with a shotgun held over his shoulder. Officer Pate was unsure of the timeframe during which this photograph was taken, but he said that it appeared to be close in time to the assault.

Officer Pate testified that he interviewed the Defendant about the assault and that the version of events the Defendant provided differed from the account the Defendant gave to the officer creating the presentence report. During Officer Pate's interview with the Defendant, the Defendant told him that the assault occurred because of "racial slurs that were said." The Defendant also told him that he was the "last one there so that's why he assaulted [the victim]." In the presentence report, the Defendant did not mention any racial slurs.

The State then played the video of the assault. The video, which was entered into evidence, showed the Defendant's friends attempting to restrain the Defendant. The Defendant broke free and repeatedly hit the victim in the face, throwing several punches directly at the victim's face until the assault was stopped by bystanders.

Officer Pate noted that one of the men in the group of suspects can be heard yelling "Westside MF'ers." Officer Pate clarified that "Westside" was gang affiliation language. Officer Pate said that the police department was requesting that the Defendant be sentenced to incarceration.

During cross-examination, Officer Pate testified that it was clear that the Defendant did not make the video in question. Officer Pate was unaware who uploaded the video to the website where he viewed the video. The officer agreed that the Defendant had no control over how many people viewed the video online or who commented on the video.

2

Officer Pate said that the Defendant voluntarily came and spoke with him before the Defendant was charged with this offense. He agreed that the Defendant was both polite and respectful at that time. The Defendant told him that a female accompanying the victim made the first contact between the two groups by commenting to one of the Defendant's friends that he should "pull [his] damn pants up." After that comment was made, the victim and another male in his group approached the Defendant and his group.

Officer Pate agreed that "Westside" was a word used in multiple hip hop songs, but he indicated that artists, such as "Snoop Dogg," were Crip's gang members.

During redirect-examination, Officer Pate testified that there was a second video recovered from the surveillance video at the Cookout. It showed that the Defendant left the restaurant before the altercation, shutting the front door behind him. At another man's request, he came back into the restaurant.

The victim testified that he was twenty years old at the time of the sentencing hearing and nineteen years old and a freshman at the University of Tennessee at the time of this incident. The victim said that his friend had knocked a milkshake out of the hands of one of the Defendant's friends. The victim recalled standing in a group of the Defendant's friends attempting to diffuse the situation by offering to replace the milkshake and informing them that they did not wish to fight. Someone hit the victim's friend, who fell toward the victim, knocking the victim on a chair. The victim said he was then hit. He never saw the initial hit coming, and he did not recall the subsequent hits that were shown on the recording. The victim said that he never spoke directly to the Defendant before the Defendant repeatedly hit him.

The victim said that, as a result of this assault, his jaw was broken in three or four places. For doctors to fix the breaks, they had to insert a plate, making it impossible for the victim to eat. He lost twenty-eight pounds. The victim said that he missed classes and suffered pain. The victim said that he lost feeling in a portion of his face due to the nerve damage and, at the time of sentencing, the feeling had not returned. Doctors were hopeful that it would eventually return. The victim said that he had $15,000 in medical bills, of which $4,000 or $5,000 was not covered by insurance.

During cross-examination, the victim said that a female that he was with said to the Defendant's group, "Pull your pants up." The victim agreed that, at some point, he and his friend got up from their seats, and the Defendant's friends also got up. The male with the victim made the initial aggressive move by knocking a milkshake out of the hand of the Defendant's friend. The victim reiterated that he attempted to diffuse the situation by offering to buy a new milkshake and saying that they did not want to fight.

3

The Defendant testified that he was born in Detroit, Michigan and raised in Knoxville, Tennessee by his father. He said that the picture from his Instagram account was "a long time ago." The Defendant said that, at the time of this picture, he was sixteen or seventeen years old, in high school, and following the "wrong crowd." The Defendant said that he had learned from his mistakes. The Defendant said that he had never joined a gang and that he thought they were "horrible."

The Defendant testified that he had not uploaded the video to the website, had not commented on it, and had no control over it. He further testified that he was truthful when speaking with the officer in this case. He described the incident saying that, when they were at the door of the restaurant, the victim and the victim's friend, who were both intoxicated, approached them. The Defendant's friend told them to back up. The victim's friend "smacked" a milkshake out of the Defendant's friend's hand and called them the "N" word. The Defendant said that, when the victim got pushed towards him, he thought the victim was making an aggressive move towards him so he hit him.

The Defendant said that he had told the probation and parole officer that he smoked marijuana, as many as ten to fifteen marijuana cigarettes a day. He stopped using marijuana when he learned that he would be drug tested, and he had not smoked marijuana since being on probation.

The Defendant said that he had graduated from high school and enrolled as a student in community college for a period of time. He obtained employment with a moving company and subsequently with Home Depot. The Defendant said that he felt that "[b]oth the victims" were in the wrong because "[t]hey both used the "N" word." He said to the victim "I feel like both of us was in the wrong really. We both got to make up for our mistakes."

The Defendant described a previous assault charge for which he had received diversion. He said that a female friend was mad at him because he was cheating on her. She smacked him and he "shoved her off of" him as she was punching and smacking him. He pleaded guilty to assault.

During cross-examination, the Defendant said that he had not smoked marijuana since before he pleaded guilty in February. He agreed that he tested positive for marijuana the day of the sentencing hearing, but he said that must be from the marijuana that he had smoked before his guilty plea. He agreed that his drug test for marijuana for his employment was negative and that this test was shortly before the sentencing hearing. He maintained that he had not smoked marijuana since shortly after his plea, so the test showing he had must be wrong.

The Defendant agreed that he had been at the restaurant with six or seven of his friends and that, after eating but before this incident, he left the restaurant. One of his

4

friends requested that he return, and the Defendant said he returned because he believed there was going to be a fight. The Defendant said that he did not feel threatened by the victim and that the only reason that he hit the victim was because the victim "came close to [him]." The Defendant agreed that, in the video, one of the Defendant's friends attempted to restrain the Defendant but that this did not deter him from assaulting the victim.

About the previous assault, the Defendant said that the warrant incorrectly indicated that he had been harassing the victim before he assaulted her. He denied saying to her that they were not at school so now he could "kick [her] fucking ass." He agreed that this warrant was read out loud before he pleaded guilty, but he said that he did not do those things. He denied smacking the girl in the face and then hitting her with his closed fist. The Defendant said that he only pleaded guilty "just because [he] wanted to get out of trouble fast." The Defendant agreed he received probation. He did not agree that probation did not work for him, saying that he would have never hit the victim if the victim had not come close to him.

The Defendant noted that he had used a lot of marijuana in the past. When the State asked him where he obtained his marijuana, the Defendant said "I get it from where I get it from. I can't tell you where I get it from." The Defendant then offered the first name of the man who sold him marijuana but said he did not know his last name or address. He agreed he purchased marijuana from this seller every day for four years but maintained that he did not know the seller's address.

Upon questioning by the trial court, the Defendant said that the pictures of him showing the gang signs were because he was young and immature and following the wrong crowd.

Based upon this evidence, the trial court found the following:

You know, [Defendant], when I read this presentence report after I had seen the video of what happened within that restaurant, I was confident that this was a case that did not call out for straight probation.

This wasn't a fight. You know, I'm a hick from Loudon County, I grew up fighting all the way up through school, but a fight is when two people are standing there squaring off toe to toe, one's throwing a punch, and the other one's throwing a punch. This wasn't a fight.

So I'm looking at the presentence report, I'm remembering the video, I didn't ever really think that probation – straight probation was a good or viable option in this case. But if you could do more wrong today in

5

this hearing than what you've done, I'm having a hard time imagining how that could be.

General Morton makes the very valid point, and I know why he was putting in – of course you don't own that website, of course you don't have any responsibility for loading that video, but the fact remains that that is on the internet, all you have to do is Google Knoxville Cookout fight, boom, up it pops.

And anybody and everybody can watch that. And they watch an individual, who as we just saw, is standing there, as he testified, trying to diffuse a bad situation. His friend was the one that did whatever it was that happened. And you weren't even present for a part of this.

But you came in, it's obvious, you can see it in the video, people are trying to hold you back but you just can't have that. You've got to get in the middle of this and have a piece of the action.

And then you pummeled, you hit him time after time after time as he's standing there. And he did nothing. There is no way any reasonable person could think that there was any further need to defend yourself when there wasn't the need to defend yourself on the front end.

And then you come in here today, the chance at sentencing to truly express remorse and truly be sorry, and you suggest he's got some fault in this.

I was contemplating when I came in here today giving you a split confinement sentence and letting you do some time in local custody, the balance served on some form of probation, but I'm not doing it now. You are going to the penitentiary. Stand up.

Based upon your previous plea of guilty, the Court having previously found you guilty in case number 103214 of aggravated assault, and having previously entered a sentence of six years, you are ordered to serve that sentence in the Tennessee Department of Corrections. Your bond's revoked. You're in custody.

It is from this judgment that the Defendant now appeals.

**II. Analysis**

6

On appeal, the Defendant contends that the trial court erred when it denied him an alternative sentence. He notes that the victim's friend made the first aggressive move and, while the Defendant overreacted, he simply engaged in "imperfect self defense." He further notes that the victim never fell down, so it was not apparent that the victim was helpless. The State counters that the trial court did not abuse its discretion when it ordered that the Defendant serve his sentence in confinement.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) (2014) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a) (2014). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-35-303(b); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

7

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1) (2014). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103. We also observe that the lack of remorse has a direct bearing on a defendant's prospect for rehabilitation. *State v. Richerson*, 612 S.W.2d 194, 196 (Tenn. Crim. App. 1980).

The record supports the trial court's findings in this case. Two years before this incident, in 2012, the Defendant pleaded guilty to assault, and the trial court granted him diversion. The Defendant said that he pleaded guilty to assault based upon the State's incorrect allegation that he hit a female victim with an open hand and then again with a closed fist. In this case, the Defendant, a Crips gang member, was not present for a portion of an altercation between his friends and two other men. He came back into the restaurant, saw the victim get shoved toward him, and then repeatedly hit the victim, who was not in an aggressive stance and was attempting to diffuse the situation. The Defendant hit the victim directly in the face using both his fists and landing at least nine direct blows. The Defendant said that he did not feel "threatened" by the victim but that he hit him because the victim "came close to him." The victim's jaw was broken in three or four places, and he required extensive medical care for a prolonged period of time. Even after agreeing that the victim was attempting to diffuse the situation, the Defendant said that he felt that "[b]oth the victims" were in the wrong because "[t]hey both used the "N" word." He said to the victim "I feel like both of us was in the wrong really. We both got to make up for our mistakes." The Defendant showed a lack of candor by denying both the allegations supporting his previous convictions and that he used marijuana before his court hearing. He expressed a lack of remorse and ability to understand that his actions were not justified, which show his lack of potential for rehabilitation. The trial court did not err when it denied the Defendant an alternative sentence. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER

8